UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
TAPINDER SINGH, et al.,                          :

         Plaintiffs,                    :    OPINION AND ORDER

  -v.-                                                   :
                                                                        13 Civ. 1860 (VSB) (GWG)
PENSKE TRUCK LEASING CO., L.P.,       :

         Defendant.                    :
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiffs Tapinder Singh and Harvinder Kaur bring this motion seeking sanctions for spoliation of evidence against defendant Penske Truck Leasing Co., L.P. ("Penske").[1]  For the reasons stated below, this motion is denied.

I.    FACTUAL BACKGROUND

      Tapinder Singh and his wife, Harvinder Kaur, assert claims for personal injuries and derivative liability stemming from Singh's fall from the hydraulic lift gate of a Penske truck on January 11, 2012.  See Third Amended Complaint, filed July 22, 2013 (Docket # 23) ("Compl."), ¶¶ 16, 23-26.  In October 2004, Penske had entered into a Vehicle Lease Service Agreement with the restaurant Papa John's.  See Vehicle Lease Service Agreement, dated Oct. 6,

---

[1] See Notice of Motion, dated Nov. 19, 2014 (Docket # 50) ("Notice of Motion"); Memorandum of Law Submitted in Support of Plaintiffs' Motion for Sanctions Against Defendant for Their Spoliation of Evidence, dated Nov. 19, 2014 (Docket # 51) ("Pl. Mem."); Declaration of Michael F. Rubin in Support of Plaintiffs' Motion for Sanctions Against Defendant for Spoliation of Evidence, dated Nov. 19, 2014 (Docket # 52) ("Rubin Decl."); Affirmation in Opposition to Plaintiff's Motion for Sanctions for Spoliation of Evidence, dated Nov. 25, 2014 (Docket # 53) ("Dunn Aff."); Memorandum of Law in Opposition to Plaintiff's Motion to Strike Defendant's Answer Based Upon Alleged Spoiliation [sic] of Evidence, dated Nov. 25, 2014 (Docket # 54) ("Def. Mem."); Reply to Defendant's Opposition to Plaintiffs' Motion for Spoliation of Evidence, dated Dec. 3, 2014 (Docket # 55); Declaration of Michael F. Rubin in Support of Plaintiffs' Reply to Defendant's Opposition to Plaintiffs' Motion for Spoliation of Evidence, dated Dec. 3, 2014 (Docket # 56).

2004 (annexed as Ex. B to Rubin Decl.).  Under this agreement, Penske leased vehicles to Papa John's, and Penske was required "to keep the [Leased] Vehicles in good repair and operating condition."  Id. ¶ 1.  On the date of the accident, Singh was employed by Papa John's as a delivery driver.  See Deposition of Tapinder Singh, dated Nov. 8, 2013 (annexed in part as Ex. A to Rubin Decl.), at 12-14.  Singh was operating one of the Penske vehicles, identified as unit number 491646 ("Vehicle 491646"), when he was injured.  See Penske Incident Report, dated Jan. 11, 2012 (annexed as Ex. E to Rubin Decl.).  Plaintiffs allege that on January 11, 2012, Singh was "preparing to make a delivery" in the Bronx when "he observed what he believed to be a dangerous leak of hydraulic fluid from the liftgate area of [Vehicle 491646]."  Compl. ¶ 13.  Penske came to repair the lift gate that same day.  Id. ¶ 14.  "Upon being advised that the truck was repaired and was safe to operate," Singh proceeded to the next delivery location.  Id. ¶ 15.  Plaintiffs allege that when Singh operated the lift gate, "the liftgate failed and [Singh] was caused to fall from the liftgate to the ground where he sustained serious personal injuries."  Id. ¶ 16.

Penske has a "preventative maintenance program," under which the leased trucks are inspected approximately every 90 to 100 days (the "PM Inspection").  See Deposition of Dominick D'Ambrosio, dated Feb. 7, 2014 (annexed in part as Ex. D to Rubin Decl.), at 15-16.  These PM Inspections are conducted using a pre-printed checklist (the "PM Checklist").  See Deposition of Patrick Dorta, dated Feb. 7, 2014 (annexed as Ex. G to Dunn Aff.) ("Dorta Dep."), at 69-74.

On January 3, 2012, eight days before Singh's accident, Vehicle 491646 underwent a scheduled PM Inspection.  This is reflected in a "Repair Order" issued the same day, which notes that "PM" inspections occurred as to the "reefer trailer," lift gate, and trailer.  See Penske Truck

Leasing Co. L.P. Repair Order 7434-155812, dated Jan. 3, 2012 (annexed as Ex. B to Rubin Decl.) ("Jan. 3 Repair Order"). The individual who conducted the inspection, Patrick Dorta, testified at a deposition that he would not have conducted the January 3, 2012 PM Inspection without also completing a PM Checklist. See Dorta Dep. at 74.

      The Jan. 3 Repair Order also lists various "complaints," such as "reefer doors don't close" and "adj belts." See id. at 1-3. For each complaint, there is a box that is filled in for "cause," "correction," and "notes." Id. Job No. 4 of the Repair Order lists one complaint as "liftgate inop." Id. at 2. It indicates that the "cause" is "wiring," and that the "correction" is "repair lift gate wiring." Id. The "notes" state: "repair lift gate wiring as needed; secure wiring and verify proper operation." Id. On January 5, 2012, a repair was made to the "interior light wiring cargo box." Penske Truck Leasing Co. L.P. Repair Order 7434-157200, dated Jan. 5, 2012 (annexed as Ex. E Part 1 to Dunn Aff. at 10). Following Singh's injury, Vehicle 491646 underwent further repairs as reflected in a Repair Order dated January 19, 2012. See Penske Truck Leasing Co. L.P. Repair Order 7434-157430, dated Jan. 19, 2012 (annexed as Ex. B to Rubin Decl.). This Repair Order indicates that the "pump box" needed to be replaced because it was "rotted away and falling off." Id. Under "correction," the form states: "replace reservoir assembly — hydraulic system/lift gate." Id. These repairs were also reflected in a "Customer Audit Report." See Penske Truck Leasing Co. Customer Audit Report by Unit, dated Oct. 25, 2012 (annexed as Ex. C to Dunn Aff.) ("Customer Audit Report"), at 10.

      On September 18, 2012, and October 18, 2012, plaintiffs sent letters to Penske informing it of the impending litigation and requesting documents related to Vehicle 491646. See Rubin Decl. ¶ 16; Letter from Michael F. Rubin, Esq., dated Oct. 18, 2012 (annexed as Ex. A to Dunn. Aff.); Letter from Michael F. Rubin, Esq., dated Sept. 18, 2012 (annexed as Ex. A to Dunn Aff.).

Penske says that it received both letters on October 25, 2012.  See Affidavit of Merit in Opposition to Plaintiff's Motion for Sanctions Based Upon Spoliation of Evidence, dated Nov. 24, 2014 (annexed as Ex. B to Dunn Aff.) ("Hansen Aff."), ¶ 3.  Upon receipt of plaintiffs' letters, Penske Litigation Claims Examiner Kresten Hansen "opened a litigation claim" and "conducted a search for the pertinent documents related to the subject trailer." Id. ¶ 4.  Specifically, Hansen "saved electronic copies of the Penske ServiceNet records for [Vehicle 491646], including a Customer Audit Report, as well as copies of all of the electronic Repair Orders, and outside vendor service records." Id. ¶ 6.  Hansen also requested the "Unit Jacket File," which is "the physical file maintained by Penske for [Vehicle 491646] where non-electronic records regarding its maintenance are located, including Driver Vehicle Incident Reports and [PM] Checklists." Id. ¶ 5.  However, "[t]he Preventative Maintenance Form completed by service technician Mr. Patrick Dorta for the Preventative Maintenance performed on the subject trailer on January 3, 2012," — that is, the PM Checklist — "was not contained in the Unit Jacket File when [Hansen] requested it on October 25, 2012." Id. ¶ 12.  Hansen explains that the Unit Jacket File is the only location where such a record would be kept and he does not know why the PM Checklist for the January 3, 2012 PM Inspection was not in that file.  Id. ¶ 13.  The contents of the Unit Jacket File were provided to plaintiffs.  Id. ¶ 9.

Plaintiffs now seek sanctions based on Penske's failure to produce the PM Checklist of January 3, 2012 (the "January 3 PM Checklist").  Specifically, they seek either entry of default against Penske or an adverse inference instruction to the jury.  Pl. Mem. at 1.[2]

---

[2] Plaintiffs' notice of motion also mentions as a form of relief an order precluding Penske from offering evidence of "non-negligent truck maintenance, and/or defendant's affirmative defenses." Notice of Motion at 1.  This request, however, is not referred to, let alone discussed, in either of plaintiffs' memoranda of law.  Nor is it mentioned in the affidavit of

II.     LAW GOVERNING MOTIONS FOR SPOLIATION SANCTIONS

Spoliation is "'the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001) (quoting West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)).  A party seeking spoliation sanctions has the burden of establishing the elements of a spoliation claim.  Id. at 109; accord Centrifugal Force, Inc. v. Softnet Commc'n, Inc., 783 F. Supp. 2d 736, 740-41 (S.D.N.Y. 2011) (citation omitted).  These elements are (1) that "the party having control over the evidence . . . had an obligation to preserve it at the time it was destroyed"; (2) that the evidence was "destroyed with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense.  Byrnie, 243 F.3d at 107-09 (alteration in original) (citations and internal quotation marks omitted); accord Chin v. Port Auth. of N.Y. & N.J., 685 F.3d 135, 162 (2d Cir. 2012).  Any sanction imposed should be designed to "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party."  West, 167 F.3d at 779 (citations and internal quotation marks omitted); accord Chin, 685 F.3d at 162.  Additionally, "[i]t is well accepted that a court should always impose the least harsh sanction that can provide an adequate remedy.  The choices include — from least harsh to most harsh — further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal."  Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 685

---

counsel in support of the motion.  See Rubin Aff. ¶ 22.  Accordingly, we do not address it further.

F. Supp. 2d 456, 469 (S.D.N.Y. 2010) (internal citations omitted), abrogated on other grounds by Chin, 685 F.3d 135.

III.     DISCUSSION

    A.     Obligation to Preserve

To meet the first element, plaintiffs must show that Penske "had an obligation to preserve [the evidence] at the time it was destroyed." Byrnie, 243 F.3d at 107 (citation and internal quotation marks omitted). In the usual situation, "[t]he obligation to preserve evidence arises when [a] party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001) (citation omitted); accord R.F.M.A.S., Inc. v. So, 271 F.R.D. 13, 23 (S.D.N.Y. 2010); Scalera v. Electrograph Sys., Inc., 262 F.R.D. 162, 171 (E.D.N.Y. 2009); Treppel v. Biovail Corp., 249 F.R.D. 111, 118 (S.D.N.Y. 2008). Thus, this obligation to preserve evidence arises "most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, for example, when a party should have known that the evidence may be relevant to future litigation." Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998) (citations omitted).

This case does not represent the usual situation, however. In the typical case where a party is seeking spoliation sanctions, a court must determine when the party responsible for the evidence is chargeable with the duty to preserve it. Here, Penske had an obligation to preserve the evidence from the moment it was created. This obligation arose because of the Federal Motor Carrier Safety Regulations — specifically, 49 C.F.R. § 396.3, which is made applicable to Penske by 49 C.F.R. § 390.3.

Section 396.3 provides that the "records required by this section shall be retained where

the vehicle is either housed or maintained for a period of 1 year." Id. § 396.3(c). Penske does not contest that 49 C.F.R. § 396.3 applies to it; instead Penske argues that it is not required to "retain every piece of paper related to one of its vehicles" but rather only "a record of its repairs, which Penske has done." Def. Mem. at 11. However, the text of the regulation makes clear that Penske is required to retain, inter alia, any "record of inspection, repairs, and maintenance." 49 C.F.R. § 396.3(b)(3) (emphasis added). Penske does not explain why a PM Checklist created during a PM Inspection is not a "record of inspection" within the meaning of the regulation.

> The Second Circuit has held that
>
> under some circumstances, . . . a regulation can create the requisite obligation to retain records, even if litigation involving the records is not reasonably foreseeable. For such a duty to attach, however, the party seeking the inference must be a member of the general class of persons that the regulatory agency sought to protect in promulgating the rule.

Byrnie, 243 F.3d at 109 (citation omitted); see also Scalera, 262 F.R.D. at 173-74 (records-retention regulation imposed on defendants an obligation to preserve documents). Here, the purpose of the regulations is "to promote the safe operation of commercial motor vehicles" and "to minimize dangers to the health of operators of commercial motor vehicles and other employees whose employment directly affects motor carrier safety." 49 U.S.C. § 31131(a). Defendants do not contest that Singh is a member of the general class of persons that the regulations were intended to protect. Thus, we conclude that the spoliation doctrine obligated Penske to preserve the January 3 PM Checklist for a period of at least one year. Penske concedes that it could not find the record when it looked in October 2012, within the one year retention period imposed by the regulation. See Hansen Aff. ¶¶ 12-13. Thus, the loss or destruction of the record necessarily occurred while Penske had an obligation to preserve it.

B.    Culpable State of Mind

A party seeking spoliation sanctions must also show that the evidence was destroyed "with a culpable state of mind." Byrnie, 243 F.3d at 109. Failures to preserve evidence "occur along a continuum of fault — ranging from innocence through the degrees of negligence to intentionality." Reilly v. Natwest Mkts. Grp. Inc., 181 F.3d 253, 267 (2d Cir. 1999) (citation and internal quotation marks omitted). The Second Circuit has held that spoliation sanctions may be appropriate where evidence was destroyed merely "negligently." Byrnie, 243 F.3d at 109.

Here, there is no evidence at all that Penske acted in bad faith or intentionally destroyed the document. Nor do we see a basis for finding "gross negligence." See generally Chin, 685 F.3d at 162 ("We reject the notion that a failure to institute a 'litigation hold' constitutes gross negligence per se.") (citation omitted); see also Zimmerman v. Poly Prep Country Day Sch., 2011 WL 1429221, at *22 (E.D.N.Y. Apr. 13, 2011) ("Gross negligence has been described as a failure to exercise even that care which a careless person would use.") (citation and internal quotation marks omitted).

Whether Penske has been shown to have acted negligently is a closer question. In Byrnie, the Second Circuit noted that while "a regulation may supply the duty to preserve records," the party seeking sanctions must still "demonstrate first that the records were destroyed with a culpable state of mind (i.e. where, for example, the records were destroyed knowingly, even if without intent to violate the regulation, or negligently)." 243 F.3d at 109. Plaintiffs point to the federal regulation that required Penske to preserve the inspection record and argue that a "violation of a regulation is considered to be at least some evidence of negligence." Pl. Mem. at 7.

Plaintiffs' argument invites us to look to tort rules in determining Penske's culpability.

8

Penske does not oppose this exercise, and we find it appropriate to do so inasmuch as "negligence" is a tort standard.  Under New York law, "a violation of a regulation — as opposed to a statute — is not negligence per se but merely 'some evidence' of negligence." Pasternack v. Lab. Corp. of Am., 892 F. Supp. 2d 540, 555 (S.D.N.Y. 2012) (quoting Chen v. United States, 854 F.2d 622, 627 (2d Cir. 1988)).  We do not see any reason not to apply the same logic in the spoliation context.  Thus, we conclude that the fact that Penske did not maintain the PM Inspection record as required by federal regulations constitutes "some evidence" of negligence on Penske's part, though it does not definitively answer the question of whether Penske acted negligently.

In light of the obligation to preserve the January 3 PM Checklist imposed on Penske by the regulation, we would expect that Penske would be able to explain what efforts it made to comply with the regulation.  But Penske merely informs the Court that the "Unit Jacket File" is the only location where an inspection record "would be kept" and that the January 3 PM Checklist was not there when an employee looked for it.  Hansen Aff. ¶¶ 12-13.  Penske gives no explanation of its procedures for maintaining Unit Jacket Files, the location of the Unit Jacket Files, who is given access to these files, or anything else about how they are kept.  Given the lack of procedures for maintaining the integrity of these files, we conclude that Penske acted negligently in failing to maintain a copy of the January 3 PM Checklist.  See M & T Mortg. Corp. v. Miller, 2007 WL 2403565, at * 9 (E.D.N.Y. Aug. 17, 2007) ("the failure of the . . . defendants to preserve or produce . . . records in the face of the widely known legal obligation to do so is probative of their culpable state of mind.").

  C. Relevance

With respect to the relevance factor, a court must determine

9

> "whether there is any likelihood that the destroyed evidence would have been of the nature alleged by the party affected by its destruction." Kronisch, 150 F.3d at 127. The burden falls on the "prejudiced party" to produce "some evidence suggesting that a document or documents relevant to substantiating his claim would have been included among the destroyed files." Id. at 128.

Byrnie, 243 F.3d at 108. In this context, the term "relevance" means "something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence." Residential Funding Corp., 306 F.3d at 108-09 (internal quotation marks and footnote omitted). However, courts must take care not to "hold[] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence," because doing so "would subvert the . . . purposes of the adverse inference, and would allow parties who have . . . destroyed evidence to profit from that destruction." Kronisch, 150 F.3d at 128.

Relevance may be established in two ways. "First, it may be inferred if the spoliator is shown to have a sufficiently culpable state of mind." Chan v. Triple 8 Palace, Inc., 2005 WL 1925579, at *8 (S.D.N.Y. Aug. 11, 2005). Where the moving party "adduces evidence that its opponent destroyed potential evidence (or otherwise rendered it unavailable) in bad faith or through gross negligence (satisfying the 'culpable state of mind' factor), that same evidence of the opponent's state of mind will frequently also be sufficient to permit a jury to conclude that the missing evidence is favorable to the party (satisfying the 'relevance' factor)." Residential Funding Corp., 306 F.3d at 109 (footnote omitted). As we have noted, there has been no showing of bad faith or gross negligence with respect to the loss of the January 3 PM Checklist. Accordingly, we cannot infer that the January 3 PM Checklist was relevant based on the Penske's state of mind alone.

"Where the party destroyed evidence due to ordinary negligence, the burden falls on the prejudiced party to produce some evidence suggesting that a document or documents relevant to

10

substantiating his claim would have been included among the destroyed files." Gutman v. Klein, 2008 WL 4682208, at *7 (E.D.N.Y. Oct. 15, 2008) (citations omitted and internal punctuation altered). In other words, it is not enough for plaintiff to show that the lost evidence is probative. Rather, plaintiff must show that the evidence would have been favorable to its case. See Chin, 685 F.3d at 162 (movant must show, inter alia, that "'a reasonable trier of fact could find that [the destroyed evidence] would support [the movant's] claim or defense'") (quoting Residential Funding Corp., 306 F.3d at 107); accord In re Pfizer Inc. Securities Litig., 288 F.R.D. 297, 315 (S.D.N.Y. 2013) (citing cases); Golia v. Leslie Fay Co., Inc., 2003 WL 21878788, at *10 (S.D.N.Y. Aug. 7, 2003) (plaintiffs established that the missing "documents were relevant, by proffering sufficient evidence from which a jury could conclude that the documents contained evidence that would have been favorable to their claims") (citation omitted). Thus, sanctions will be denied in the absence of any "extrinsic evidence . . . tending to show that the destroyed evidence would have been unfavorable to the spoliator." Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 77 (S.D.N.Y. 1991); accord Hawley v. Mphasis Corp., 302 F.R.D. 37, 49-50 (S.D.N.Y. 2014) (denying sanctions where movant did not "demonstrate that the documents would support his claims").

      Plaintiffs contend that the January 3 PM Checklist meets the "relevance" requirement because "repair records that reflect on the quality, and even the existence, of the PM Inspection, are no doubt relevant to the claim made." Pl. Mem. at 9. However, the mere fact that the January 3 PM Checklist is relevant in the sense that it may be probative of the issues underlying plaintiffs' claims is not sufficient to show that it would have been "unfavorable" to Penske or that it would have supported plaintiffs' claims. While plaintiffs emphasize that the January 3 PM Checklist was created merely days before Singh's accident, id. at 8-9, they fail to provide

any evidence as to why the close proximity in time means that the January 3 PM Checklist would be favorable to them or unfavorable to Penske. Plaintiffs also assert that "without the [PM] checklist and its related documents, [they] cannot know if the inspection revealed the need for repairs that were not made." Id. at 10. But this argument is simply an assertion that the January 3 PM Checklist is probative of the issues in this case, not that it contained evidence favorable to plaintiff's case.

In the end, plaintiffs fail on this prong because "some extrinsic evidence demonstrating that a reasonable trier of fact could find that the missing evidence would support [plaintiffs'] claims is necessary." Hawley, 302 F.R.D. at 47-48 (punctuation altered and citations omitted); accord Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409, 439 (S.D.N.Y. 2009) ("[W]hen the destruction of evidence is negligent, relevance must be proven through extrinsic evidence by the party seeking sanctions.") (citation omitted). Absent this showing, the claim for spoliation sanctions must fail. See Orbit One Commc'ns, Inc. v. Numerex Corp., 271 F.R.D. 429, 441 (S.D.N.Y. 2010) ("Sanctions [are not] warranted by a mere showing that a party's preservation efforts were inadequate.").

All this being said, we emphasize that this ruling applies only to plaintiffs' request for spoliation sanctions. It does not address the relevance or admissibility at trial of the fact that Penske lost the January 3 PM Checklist. Also, this ruling does not address the question of whether a permissive adverse inference instruction may be appropriate notwithstanding plaintiffs' failure to meet the elements of a spoliation claim. As the Second Circuit has made clear, a permissive (as opposed to mandatory) adverse inference instruction does not necessarily reflect a sanction, and its delivery to a jury does not require the same findings necessary to impose a spoliation sanction. See Mali v. Fed. Ins. Co., 720 F.3d 387, 391-94 (2d Cir. 2013);

Klipsch Grp., Inc. v. Big Box Store Ltd., 2014 WL 904595, at *4 (S.D.N.Y. Mar. 4, 2014) ("a permissive adverse-inference instruction does not amount to a sanction and hence does not require" the findings necessary to impose a spoliation sanction). The decision whether to grant a permissive adverse inference instruction will necessarily be informed by factors and evidentiary support different from what is necessary to obtain a spoliation sanction. Accordingly, this Opinion and Order should not be construed as opining on whether plaintiffs are entitled to such an instruction at trial of this matter.

IV. CONCLUSION

For the foregoing reasons, plaintiffs' motion seeking sanctions for spoliation of evidence (Docket # 50) is denied.

SO ORDERED.

Dated: February 26, 2015
   New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge